UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FRED D. WILSON, ) | |
| ) | |
| Plaintiff, ) | No. 17 C 3917 |
| ) | |
| v. ) | |
| ) | Judge Edmond E. Chang |
| GHALIAH OBAISI, as Independent ) | |
| Executor of the Estate of Saleh Obaisi, ) | |
| ARTHUR FUNK, LOUIS SCHICKER, and ) | |
| WEXFORD HEALTH SOURCES, INC., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Fred Wilson brings this civil-rights lawsuit, 42 U.S.C. § 1983, against certain prison officials and medical-care personnel, alleging that they were deliberately indifferent to his medical needs when he was an inmate at Stateville Correctional Center.[1] R. 82, Am. Compl. ¶ 1. Wilson names as defendants Dr. Saleh Obaisi,[2] the former Medical Director at Stateville; Dr. Arthur Funk, the former Regional Medical Director for Wexford Health Sources (a private corporation that provides medical services at Stateville); Dr. Louis Shicker,[3] the former Agency Medical Director for the Illinois Department of Corrections (or IDOC for short); and Wexford Health Sources. *Id.* ¶¶ 4-7. One of the Defendants, Dr. Shicker, now moves to dismiss the Amended

---

[1]The Court has subject matter jurisdiction over this case under 28 U.S.C. § 1331.
[2]As a formal matter, the named defendant is actually the Estate of Saleh Obaisi. After Obaisi's death in December 2017, Wilson replaced Obaisi with the Estate as the named defendant. R. 43.
[3]Although the case caption identifies this defendant as "Louis Schicker," the Court will use "Shicker" because that is how the Defendant spells it in his motion. *See* R. 88.

Complaint for failure to adequately state a claim. Fed. R. Civ. P. 12(b)(6); R. 88. For the reasons explained below, the motion is granted and Wilson's suit is dismissed as to Shicker with prejudice.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in Wilson's Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). At the relevant time, Wilson was housed at Stateville Correctional Center in Illinois. Am. Compl. ¶ 2. At some point in 2007, Wilson was lifting weights when he heard a pop in his left shoulder and immediately felt pain there. *Id.* ¶ 13. In November 2007, Wilson saw a Stateville doctor—alleged to be a "Dr. P. Ghosch"[4]—who documented tenderness to palpation, as well as decreased strength and range of motion in the left shoulder. *Id.* ¶ 17. Ghosch ruled out any degenerative joint disease or bursitis with an x-ray. *Id.* ¶¶ 17-18.

In January 2008, after Wilson continued to complain of left shoulder pain, he was taken to the University of Illinois – Chicago Medical Center (UIC) for an MRI. Am. Compl. ¶ 20. The attending physician there allegedly told Wilson that he would probably need arthroscopic surgery to correct the problem and relieve the pain. *Id.* ¶ 22. Moreover, the MRI report ultimately showed moderate tendinopathy in the distal supraspinatus tendon; moderate hypertrophy of the AC joint causing mild compression on the underlying supraspinatus muscle; and small bony exostosis in the

---

[4] This is likely a misspelling of the name of Dr. Parthasarathi Ghosh, who was the Medical Director at Stateville at one time. *See Norwood v. Ghosh*, 723 Fed. Appx. 357, 360, 361 (7th Cir. Jan. 26, 2018) (non-precedential disposition). But the Court will use the spelling in the complaint.

2

lateral aspect of the acromion. *Id.* ¶ 21. Unfortunately, Wilson did not receive any follow-up on the MRI or treatment for his shoulder until November 2008, when he was referred to physical therapy after complaining of continued pain. *Id.* ¶¶ 23-24. But the physical therapy did not start until May 2009, and then it was discontinued after only a few sessions even though Wilson was still in pain. *Id.* ¶ 25.

In October 2010, Wilson filed his first grievance relating to his left shoulder condition. Am. Compl. ¶ 26. Then, sometime in 2011, the results of the January 2008 MRI were apparently "requested to be reprinted for further review." *Id.* ¶ 27. And in September 2011, Dr. I. K. Carter (Stateville's Medical Director at the time) said he would start giving Wilson cortisone steroid injections for the left shoulder. *Id.* ¶ 28. The first injection was administered four months later, in January 2012. *Id.* ¶ 29. At some point, Dr. Obaisi took over as the Medical Director at Stateville. *Id.* ¶ 31. Dr. Obaisi continued to give Wilson steroid injections. *Id.* But in March 2014, despite having gotten the injections for more than two years, Wilson told Dr. Obaisi that the pain was worse than it had been in 2007 (back when the left shoulder was first injured). *Id.* ¶ 33. Dr. Obaisi started giving Wilson cortisone steroid injections every three months (instead of every six months), *id.* ¶ 35, but Wilson's left shoulder pain continued, *id.* ¶ 38.

Eventually, in September 2015, a request was submitted—presumably by Stateville medical personnel—for Wilson to be sent to UIC for his chronic left shoulder pain. *See* Am. Compl. ¶ 39. More than five months later, in late-January 2016, Wilson saw Dr. Benjamin Goldberg, an orthopedic spine doctor at UIC. *Id.* ¶ 40.

3

Dr. Goldberg noted a possible rotator cuff tear and requested a new MRI of Wilson's left shoulder, as well as a follow-up in three months. *Id.* The MRI, which was conducted in July 2016, showed results similar to the 2008 MRI, except that the AC joint hypertrophy was worsening and there was a new, suspected tear of the anterior superior labrum. *Id.* ¶ 41. The UIC doctor also ordered an MRI of the cervical spine, which Wilson eventually got in April 2017. *Id.* ¶¶ 42-43. Although the MRI showed several small disc bulges, it indicated no nerve damage that could have been causing Wilson's left shoulder pain. *Id.* ¶ 43. All in all, from 2010 to 2017, Wilson ended up filing six grievances "with Stateville" about his medical conditions. *Id.* ¶ 45.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[5] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

4

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

### III. Analysis

Generally speaking, to successfully plead a § 1983 claim, a plaintiff must adequately allege that the defendant acted under color of law and deprived the plaintiff of a federal constitutional or statutory right. *Thurman v. Vill. of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). For prisoner medical-care cases in particular, "a plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition." *Perez v. Fenoglio*, 792 F.3d 768, 776 (7th Cir. 2015). But § 1983 liability must be premised on *personal* liability only: "liability does not attach unless the individual defendant caused or participated in [the] constitutional deprivation." *Rasche v. Vill. of Beecher*, 336 F.3d 588, 597 (7th Cir. 2003) (cleaned up). *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 412-14 (7th Cir. 1997) (affirming dismissal of § 1983 claims against defendant where the "complaint did not so much as assert that he was involved directly and personally, or that anything was done with his knowledge and consent.").

5

Here, Shicker correctly argues that the Amended Complaint lacks any facts that could possibly tie him *personally* to the alleged inadequacies in Wilson's medical care at Stateville.[6] R. 89, Def.'s Br. at 3-4. Aside from the caption, the Amended Complaint mentions Shicker only twice: in the introductory paragraph when listing all the Defendants, and then again to allege that Shicker was "IDOC's Agency Medical Director during at least part of the time period during which Plaintiff's claims arose." Am. Compl. ¶ 6. So there is nothing to suggest that Shicker was somehow personally involved in Wilson's medical care. In fact, the only medical professionals who treated Wilson, according to the Amended Complaint, were two physicians at UIC, as well as physical therapist Jose Becerra, nurses at the "nurse sick clinic," and Drs. Ghosch, Carter, and Obaisi at Stateville. *See generally id.*

It is true that even if Shicker did not personally treat Wilson, Shicker could still "be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *See Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (cleaned up). Once again, though, Wilson's allegations fail to support such an inference. Specifically, Wilson alleges that "[e]ach of the Defendants was aware of Plaintiff's medical condition, through (a) [his] grievances, (b) communications from [him], (c) encounters with [him] wherein he complained of continuous left shoulder pain, and/or (d) through seeing [him] for medical treatment." Am. Compl. ¶ 51. But absent *some* fact that could

---

[6]Because Wilson acknowledges that he is not suing Shicker in his official capacity for damages, R. 95, Pl.'s Resp. Br. at 3, there is no need to address Shicker's Eleventh Amendment argument, R. 89, Def.'s Br. at 2-3.

6

plausibly implicate Shicker himself, this sweeping allegation is impermissibly conclusory. *See Iqbal*, 556 U.S. at 678 (explaining that a complaint must contain more than "naked assertion[s] devoid of further factual enhancement." (cleaned up)).

Similarly, Wilson's assertion that he wrote "numerous prison officials" about his medical condition also fails to create a plausible link between Shicker and the alleged misconduct. *See* R. 95, Pl.'s Resp. Br. at 4; *see also Arnett v. Webster*, 658 F.3d 742, 759 (7th Cir. 2011) ("There must be a causal connection or affirmative link between the action complained about and the official sued[.]"). Even giving Wilson the benefit of all reasonable inferences, he does not actually allege that he wrote to Shicker, nor—at minimum—that *someone* to whom he wrote would have, in the ordinary course, discussed the letters with Shicker.

The same goes for Wilson's argument that he alerted Shicker to the alleged misconduct by filing "numerous grievances[.]" Pl.'s Resp. Br. at 3-4. For one, Wilson specifically alleges in the Amended Complaint that he "filed written grievances with *Stateville*[,]" not with IDOC. Am. Compl. ¶ 45 (emphasis added). Wilson has not alleged any facts about Shicker's duties as IDOC's "Agency Medical Director" at all, let alone any that connect Shicker with grievances filed at Stateville. And there is nothing to suggest what type of inmate-specific grievances from Stateville (if any) would ever reach the "Agency Medical Director" for IDOC—again, the job responsibilities of that role are not alleged. So even giving Wilson the benefit of reasonable inferences, no facts allow the Court to make an inferential leap to Shicker's personal involvement.

7

Moreover, the defense is correct that Wilson's reliance on *Heard v. Tilden*, 809 F.3d 974 (7th Cir. 2016), is misplaced. *See* R. 96, Def.'s Reply Br. at 3; Pl.'s Resp. Br. at 3. In *Heard*, the Seventh Circuit reversed the dismissal of Shicker (yes, the same Shicker) from a § 1983 deliberate-indifference claim alleging that he acted with deliberate indifference when he failed to stop the delays in the plaintiff's medical treatment. *See Heard*, 809 F.3d at 980-81. But in *Heard*, the plaintiff explicitly alleged that Shicker failed to stop the delays in treatment, even though Shicker *himself* had actual knowledge that the delays were causing Heard to suffer pain. *Id.* In contrast, and as explained above, Wilson's allegations do not support the inference that Shicker personally knew of Wilson's medical condition, let alone that he was directly involved in the choice to delay treatment. So *Heard* is distinguishable. The outcome might be different if, say, Wilson had alleged that Shicker regularly reviewed medical grievances from Stateville, or that Shicker personally supervised one of the Stateville doctors who treated Wilson (and in such a way that it would have given Shicker personal knowledge about Wilson). But Wilson alleges nothing of the sort.

Nor has Wilson alleged any systemic violation at Stateville that could be attributed to Shicker. Under § 1983, senior officials can be held liable for systemic constitutional violations—even if they were not personally aware of the plaintiff's specific complaints. *See, e.g.*, *Antonelli v. Sheahan*, 81 F.3d 1422, 1428-29 (7th Cir. 1996). But here, Wilson alleges that the inadequate medical care he received "was caused, at least in part, by *Wexford's* policy or practice of delaying or refusing

necessary medical care as a means of reducing costs." Am. Compl. ¶ 54 (emphasis added). In other words, Wilson does not allege a systemic violation by the *Illinois Department of Corrections*. And there is nothing in the Amended Complaint to suggest, at the very least, that Shicker's responsibilities as IDOC's Agency Medical Director included overseeing Wexford's provision of medical services. *See, e.g.*, *Antonelli*, 81 F.3d at 1428-29 (dismissing claims of "localized, non-systemic violations" as to Cook County sheriff and IDOC director because neither could "realistically be expected to be personally involved in resolving a situation pertaining to a particular inmate unless it were of the gravest nature."). So, because there are no facts to support an inference that Shicker was (1) somehow responsible for *Wexford* policies or (2) was aware of a systemic violation, Shicker cannot be liable for the alleged injuries in this case. *See Sanville*, 266 F.3d at 740. Shicker must be dismissed from this suit.

## IV. Conclusion

For the reasons discussed above, Shicker's motion to dismiss is granted. Because Wilson already amended the complaint once, and because there are no proposed additional factual allegations in the response brief, the dismissal of the claims against Shicker is with prejudice. (Wilson may move to reconsider and attach a proposed second amended complaint if he truly believes there is a reasonable basis

9

in law and fact to do so.) The status hearing of April 7, 2020 is reset to May 5, 2020, at 9:30 a.m.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 27, 2020